#24501-a-RWS

**2007 SD 127**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

\* \* \* \*

HAROLD FREDRICK BERGER,                    Plaintiff and Appellee,

  v.

LORI VAN WINSEN,                    Defendant and Appellant.

\* \* \* \*

APPEAL FROM THE CIRCUIT COURT OF
THE FOURTH JUDICIAL CIRCUIT
LAWRENCE COUNTY, SOUTH DAKOTA

\* \* \* \*

HONORABLE WARREN G. JOHNSON
Judge

\* \* \* \*

SUZANNE DARDIS of
Kinney & Dardis, LLP
Spearfish, South Dakota                    Attorneys for plaintiff
                                           and appellee.


REED C. RICHARDS of
Richards and Richards
Deadwood, South Dakota                    Attorneys for defendant
                                           and appellant.

\* \* \* \*

                                           CONSIDERED ON BRIEFS
                                           ON NOVEMBER 6, 2007

                                           OPINION FILED **12/12/07**

SABERS, Justice.

[¶1.] Harold Berger petitioned for primary physical custody of his six-year-old son, Nolan. Lori Van Winsen contested Harold's petition for custody, arguing she should have primary physical custody. After the circuit court awarded Harold primary physical custody of Nolan, Lori appealed. We affirm.

## FACTS

[¶2.] Harold and Lori met in 1997, through a mutual friend, Grant Lawley. Lori was teaching in Newell, South Dakota and Harold lived and worked in Whitewood, South Dakota. Harold and Lori dated casually, but at the end of her teaching year, Lori did not renew her contract. She moved back to Aberdeen, South Dakota, in part, to reconcile with a former boyfriend. When this reconciliation fell through, Lori became extremely depressed, attempted suicide and was hospitalized for several days.

[¶3.] Lori and Harold remained in contact and in September of 1999, Lori moved into Harold's home in Whitewood, South Dakota. Eventually, Lori became pregnant and gave birth to their child, Nolan, who is the subject of this custody dispute. The couple never married and eventually, the relationship deteriorated. Lori suspected Harold of having an affair with one of his employees. Harold asked Lori to move out in the fall of 2005. Having no home, Lori left Nolan with Harold.

[¶4.] After the break-up, Lori again became depressed. She threatened to kill Harold and take Nolan away. She drove around during a blizzard, threatening to harm herself. Shortly thereafter, she checked herself into Rapid City Regional Hospital for treatment for her depression and suicidal thoughts.

[¶5.]     After her stay in the hospital, Lori's relatives took her to Watertown to recover. She wanted to take Nolan to Watertown for two weeks over Christmas. After Lori's threats that she would take Nolan and never give him back, Harold was concerned that Lori would refuse to give Nolan back. Harold obtained legal advice and had a lawyer draft a stipulation that declared Harold was Nolan's biological father and that Harold and Lori would have joint legal custody with primary physical custody with Harold. The stipulation also outlined visitation. Lori testified she had ample time to read the document and had time to obtain a lawyer, had she the money to hire one. Lori's Aunt Brenda testified she offered to pay for an attorney. Without consulting an attorney, Lori signed the stipulation after requesting certain changes be made to the document.

[¶6.]     In 2006, she moved back to western South Dakota, moving to Lead. At this time, Lori had visitation most weekends and Nolan was with Harold during the week. Lori became dissatisfied with this arrangement and in July of 2006, she initiated proceedings to change custody. She alleged Harold's business kept him away until late at night, she could spend more quality time with Nolan than Harold and should be the primary caretaker.

[¶7.]     In order to determine custody, the circuit court ordered a home study. As a part of the custody proceedings, Lori swore in an affidavit that "she had no boyfriend and could spend quality time with Nolan all during the week." During the course of the proceedings it was discovered she became engaged to Justin Moore on September 16, 2006. Lori testified that when she signed the affidavit on July 13, 2006 she knew Moore, but had not started dating him officially until July 22, 2006.

As a result of this new relationship, the home study was conducted in not only Lori's and Harold's homes in Lead and Whitewood, South Dakota, but also Moore's home in Upton, Wyoming.[1]

[¶8.]    Dr. James Simpson conducted the home study. He found the home and environment provided by Harold to be much more stable than Lori's home. Additionally, in Whitewood, Nolan lives in the only home he has known since birth. It is a small community that knows Nolan and his paternal grandparents and aunt live there. Nolan is very attached to his home and relatives. In contrast, Lori has only lived in Upton for a short time. Moore, his 12-year-old daughter, and Moore's brother live in the community, but Lori and Nolan have no biological family there. Dr. Simpson noted that both parents are good, loving parents, but the instability in Lori's life, with the depression, new home, new job, new relationship, made uprooting Nolan from the home and town he has known his entire life not conducive to Nolan's welfare.

[¶9.]    The circuit court heard testimony from Lori, Harold, Dr. Simpson and Lori's and Harold's families. It ordered that primary physical custody should remain with Harold. Lori appeals and raises the following issue:

> Whether the circuit court abused its discretion when it determined primary physical custody of Nolan should remain with Harold.

## STANDARD OF REVIEW

[¶10.]    In custody disputes,

> We review factual determinations under the clearly erroneous standard. Therkildsen v. Fisher Bev., 1996 SD

---

1.    Van Winsen and Moore planned to be and were married in July of 2007.

> 39, ¶8, 545 NW2d 834, 836; Lindquist v. Bisch, 1996 SD 4,
> ¶16, 542 NW2d 138, 141. Questions of law, including
> statutory construction, we decide without deference to the
> circuit court's conclusions. West Two Rivers Ranch v.
> Pennington County, 1996 SD 70, ¶6, 549 NW2d 683, 685.

Fuerstenberg v. Fuerstenberg, 1999 SD 35, ¶16, 591 NW2d 798, 804. "Between parents adversely claiming custody, neither may be preferred over the other." *Id.* ¶22 (citing SDCL 25-5-7). The circuit court "gauge[s] the credibility of the witnesses and . . . weigh[s] the significance of their testimony." *Id.* (citing Kost v. Kost, 515 NW2d 209, 212 (SD 1994) (additional citation omitted)). "Trial courts possess broad discretion in deciding the best interests of a child; their decisions will only be disturbed upon a finding of abuse of discretion." Price v. Price, 2000 SD 64, ¶18, 611 NW2d 425, 430 (quoting *Fuerstenberg*, 1999 SD 35, ¶22, 591 NW2d at 807).

[¶11.]     **Whether the circuit court abused its discretion when it determined primary physical custody of Nolan should remain with Harold.**

[¶12.]     The primary consideration in custody disputes is the best interest of the child. *Id.* In determining "which parent is better equipped to provide for the child's . . . welfare," the circuit court may look at several factors, which include: "(1) parental fitness; (2) stability; (3) primary caretaker; (4) child's preference; (5) harmful parental misconduct; (6) separation of siblings; and (7) substantial change in circumstances." *Id.* ¶18.

[¶13.]     The circuit court heard testimony from various witnesses and made findings of fact and conclusions of law. It noted both Lori and Harold were good

parents. However, the circuit court noted that Nolan's home environment with Harold "offers safety, stability and security" and Lori

> Lori is unable to offer the same security and stability offered by [Harold]. She has experienced at least two failed, serious relationships and Mr. Moore is approaching his third marriage. Mr. Moore has lived in Upton less than a year, worked at his present employment for less than a year. They have live[d] together for approximately three months and Defendant has been in her present position for less than a month. If it be presumed, for purposes of this decision, that they will have a stable marriage, secure employment, will remain in Upton and that Mr. Moore's daughter will remain there as well, there is still no measurable advantage for Nolan to move to his mother's home.

[¶14.]     A review of the record demonstrates the circuit court did not abuse its discretion when determining Harold should retain primary physical custody of Nolan. Lori claims that Harold owns a mechanic business and he works long hours and relies on his mother and sister to raise Nolan. She claims that her job in Gillette as a hotel manager only requires she work from 9 a.m. to 5 p.m. so she could take Nolan to school at 8 a.m. and be home by 5:45 p.m. so she could spend quality time with Nolan before he is in bed at 8 p.m.

[¶15.]     Despite Lori's claims, the evidence suggests Harold is just as capable and does spend as much, if not more time, than Lori could spend with Nolan if she had primary physical custody. He and other witnesses testified that he drops Nolan off at school almost every morning. Nolan is picked up from school by his grandmother or aunt and Harold picks up Nolan from their homes after work. There was no testimony, besides Lori's, that Harold works until eight or nine at night on a regular basis. Dr. Simpson testified he did not get the impression that

Harold works such late hours and Harold testified as much. Harold also testified that he has flexibility in owning his business and frequently takes a day off during the week when Nolan is out of school and spends the day with him. He also attends all school events. Finally, his shop is one block from his mother's house so Nolan usually stops by the shop after school for ten to twenty minutes.[2]

[¶16.]     Ultimately, the circuit court heard and weighed the testimony and resolved any conflicts in the testimony in favor of Harold. Moreover, Dr. Simpson conducted a home study, which included interviews and tests with both Lori and Harold. He also interviewed Nolan and observed him in all three homes. Dr. Simpson interviewed and conducted psychological testing on Lori's and Harold's significant others. Simpson concluded, based in part on Lori's instability that Nolan should remain within the continuity and comforting home life that he enjoys in Whitewood. He emphasized that Lori and Harold should work to encourage Nolan's relationship with the other parent, to ensure Nolan feels comfortable and that it is okay to love and be close to both his parents. Simpson noted that Harold did a better job of encouraging and facilitating Lori's relationship with Nolan. Based on this record, there is no showing that the circuit court abused its discretion.

[¶17.]     Harold requests attorney's fees for the appeal in the amount of $3,150.00. "To determine whether attorney fees are proper in domestic relation cases, we consider, 'the property owned by each party, the relative incomes, the

---

2.    Lori also alleged that Harold did not supervise Nolan enough and the shop was too dangerous for Nolan. However, the testimony and Dr. Simpson's home study did not support these allegations.

liquidity of the assets and whether either party unreasonably increased the time spent on the case.'"  Larson v. Larson, 2007 SD 47, ¶22, 733 NW2d 272, 278 (quoting Dejong v. Dejong, 2003 SD 77, ¶30, 666 NW2d 464, 471 (quoting Peterson v. Peterson, 434 NW2d 732, 738 (SD 1989))).  When we consider these factors as they relate to this case, we conclude that each party shall bear the responsibility for their own attorney's fees.

[¶18.]	Affirmed.

[¶19.]	GILBERTSON, Chief Justice, and KONENKAMP, ZINTER, and MEIERHENRY, Justices, concur.